# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-1178

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff-Appellee, | * | Appeal from the United States |
| | * | District Court for the Western |
| v. | * | District of Missouri. |
| | * | |
| Tucson D. Redd, | * | |
| | * | |
| Defendant-Appellant. | * | |

_____

Submitted: September 13, 2002
Filed: February 4, 2003

_____

Before BYE, BEAM, and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

Tucson D. Redd appeals the district court's[1] revocation of his supervised release and imposition of an 18 month sentence of imprisonment. Because the district court did not err when it admitted written drug test results or abuse its discretion when it refused to continue the revocation hearing and refused to grant counsel leave to withdraw, we affirm.

_____

[1]The Honorable Gary A. Fenner, United States District Judge for the Western District of Missouri.

Redd pled guilty to one count of conspiracy to commit mail fraud and money laundering. He was sentenced to 12 months and one day of imprisonment to be followed by three years of supervised release. He began his term of supervised release on February 28, 2001. Over the next seven months, four violation reports were filed alleging cocaine use. The allegations were based on six positive "sweat patch" test results.[2]

On September 24, the district court ordered that Redd show cause to explain why his supervised release should not be revoked. On October 3, attorney F. Russell Millin notified the United States Attorney that he represented Redd in the revocation action.[3] On October 10, the United States Attorney notified Millin of its intent to call an expert witness and, on October 12, provided discovery to Millin. On October 22, attorney Bruce Houdek filed an appearance as additional counsel for Redd.

On December 4, Houdek filed a document entitled Motion for Leave to Withdraw as Counsel for Defendant Tucson Redd and Alternative Motion for a Continuance. In that motion (the December 4 Motion), Houdek explained that he

[2]For the purpose of the present opinion, a detailed explanation of sweat patch technology is unnecessary. Generally, as the name suggests, sweat patches are absorbent patches that may be worn by monitored individuals to collect sweat for chemical analysis. Redd made no challenge under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), to the underlying technology of the sweat patches. Rather, Redd asserted hearsay and foundation objections to the admission of the written sweat patch test results. Accordingly, because no Daubert challenge was raised, this opinion should not be read as a general endorsement or rejection of sweat patch technology.

[3]The docket does not reflect that Millin entered a formal appearance on behalf of Redd.

originally expected to be paid by Redd with proceeds from the sale of Redd's real estate but had not been paid because restitution liens made the real estate unmarketable. Houdek further stated that although Redd was employed full time, he was unable to pay a retainer or raise funds for the payment of counsel or experts. The December 4 Motion did not provide a showing of Redd's indigency, include a request for the appointment of new counsel, contain an application for payment of current counsel with CJA funds, nor include an application for the payment of expert witness fees under 18 U.S.C. § 3006A(e)(1). Rather, it contained conclusory statements to explain the need for the proposed continuance: "It is the belief of the Defendant that if the matter is continued by a period of sixty (60) days, he will be able to raise sufficient funds to employ counsel on his own." It stated further that, "significant legal, scientific, and chemical research" would be necessary in addition to the employment of an "expert or experts to consult with counsel and/or testify at the scheduled hearing . . ." Finally, the motion did not identify a specific expert, contained no specific explanation of how an expert would assist Redd, and failed to allege a factual basis to suggest how the patches might have become contaminated with cocaine from a source other than Redd's sweat.

The district court denied the motion in an order dated December 17. At the December 20 revocation hearing, Houdek renewed the December 4 Motion stating that Redd lacked sufficient resources to provide a defense. On the day of the hearing, Houdek, for the first time, made a request for the appointment of new counsel. He provided no affidavits or specific evidence regarding Redd's finances. The district court denied both the renewed motion and the last minute request for the appointment of new counsel.

At the hearing, the government introduced United States Exhibits 1A-1F over Redd's hearsay and Confrontation Clause objections. Each one of these six exhibits was a two-page document received by the probation office from its private, drug laboratory contractor, Pharm-Chem, Inc. Each of the exhibits contained the results

3

of one of the six separate sweat patch analyses as well as a chain of custody report. Redd's Supervising Probation Officer testified that the reports served as the foundation for her recommendation of revocation but that she had not participated in preparation of the reports. Redd argued that exhibits 1A-1F were hearsay because the technicians who created the records (local technicians who applied and removed the sweat patches and laboratory technicians from California who conducted analyses of the patches) were not present to provide a foundation and respond to questioning.

The United States next called an expert, Dr. Kadehjian, who interpreted the test results, discussed sweat patch methodology, and vouched for the reliability and validity of the sweat patch results. The United States also introduced a Senior United States Probation Officer who described the certification procedures for the technicians who administered and handled the patches. The technicians' training certifications were entered as exhibits.

Following the hearing, in an order dated February 15, 2002, the district court revoked Redd's supervised release and sentenced him to 18 months imprisonment. The district court relied on the sweat patch evidence to find that Redd had continued cocaine use during his term of supervised release. In addition, the district court found that Redd failed to take advantage of treatment options offered by the United States Probation Office. The district court noted that negative (no drugs detected) urinalysis test results submitted by Redd from tests conducted during his period of supervised release were consistent with the sweat patch test results – none of the negative urinalysis tests coincided with the specific time periods when Redd wore sweat patches that tested positive. The district court also noted that no evidence was submitted to indicate that the sweat patches were contaminated in any manner. Finally, the court found Redd not credible and stated that his claim to have "no idea" regarding how the sweat patches in question tested positive for cocaine was unpersuasive. Redd correctly notes that the record contains no description of the district court's findings of reliability or the district court's balancing of Redd's

Confrontation Clause rights against any good cause shown for the failure to procure direct testimony from the proposed technician-witnesses.

Redd now argues that the district court abused its discretion by denying the motion for a continuance, alternative motion for leave to withdraw, and oral request for appointment of new counsel. He also argues that the admission of United States Exhibits 1A-1F violated Fed. R. Crim. Pro. 32.1(a)(2)(D) as well as his Sixth Amendment Confrontation Clause rights because he was deprived of the opportunity to examine the technicians who created the records.[4]

## II.

We reverse a district court's denial of a requested continuance only upon a showing of a prejudicial abuse of discretion. United States v. Cotroneo, 89 F.3d 510, 514 (8th Cir. 1996) ("Continuances generally are not favored and should be granted only when the party requesting one has shown a compelling reason. We will reverse a District Court's decision to deny a motion for continuance only if the court abused its discretion and the moving party was prejudiced by the denial.") (citation omitted). In this case, the district court did not abuse its discretion when it denied the motion for continuance. The motion for continuance contained no details that would have allowed the district court to determine whether Redd would have been capable of raising funds to employ counsel. Further, Redd did not state with any specificity

---

[4]Redd also argues on appeal that it was error to admit United States Exhibit 6, Pharm-Chem's "litigation packages" that contained full laboratory reports regarding United States Exhibits 1A-1F. The United States' expert reviewed this exhibit, but it was not admitted into evidence. Accordingly, we need not address Redd's objections to United States Exhibit 6. "An expert may 'testify about facts and data outside of the record for the limited purpose of exposing the factual basis of the expert's opinion.'" Sphere Drake Ins., PLC v. Trisko, 226 F.3d 951, 955 (8th Cir. 2000) (quoting Brennan v. Reinhart Institutional Foods, 211 F.3d 449, 451 (8th Cir. 2000)).

what assistance an expert would have provided, did not offer any facts to suggest that contamination of his sweat patches occurred through some means other than his cocaine use, and did not represent that he had consulted with an expert to assess the time required for assistance. In short, Redd presented no basis for the requested continuance other than a conclusory statement that he believed he could raise sufficient funds to employ counsel if granted a continuance of sixty days. Based on this dearth of information, it was not an abuse of discretion for the district court to deny Redd's requested continuance. See Ungar v. Sarafite, 376 U.S. 575, 589 (1964) (stating that the determination of whether a denial of a motion for continuance is arbitrary is rooted "particularly in the reasons presented to the trial judge at the time the request is denied.").

A similar lack of supporting evidence leads us to conclude that the district court did not abuse its discretion when it denied Houdek leave to withdraw as counsel. United States v. Swinney, 970 F.2d 494, 499 (8th Cir. 1992) ("Whether to grant a continuance and substitution of counsel is a matter committed to the sound discretion of the district court."). Although Redd argues on appeal that the purpose of the requested leave to withdraw was to permit the reappointment of Houdek as CJA counsel, this argument was not advanced in the December 4 Motion. Rather, the motion merely recited the conclusory statement regarding Redd's ability to raise sufficient funds if granted a sixty day continuance and a claim that competent representation could not be provided absent "necessary expenditures for expert witnesses and scientific and chemical research." No evidence was provided to support the claims that Redd was unable to pay the "necessary expenses" or to inform the court as to the nature and extent of the vaguely referenced expenses. In light of the limited information and arguments actually presented to the district court, it was reasonable for the district court to conclude that the motion was merely intended to cause delay. The refusal to grant leave for Houdek to withdraw was not an abuse of discretion.

Finally, we find no abuse of discretion in the denial of the December 4 Motion as orally renewed at the December 20 hearing. Redd did not even request appointed counsel until December 20, the day of the hearing. This request was untimely and the district court's refusal to provide new counsel on the day of the hearing was not an abuse of discretion.

III.

Next we address Redd's objections to the introduction of United States Exhibits 1A-1F, the test results and chain of custody reports for the six sweat patches. Redd objected to the exhibits as hearsay and as a deprivation of his right to confront adverse witnesses. As an initial matter, we note that the Federal Rules of Evidence do not apply in revocation hearings. Fed. R. Evid. 1101(d)(3) ("The rules . . . do not apply in the following situations: . . . Proceedings for . . . granting or revoking probation . . ."). That is not to say, of course, that all hearsay is admissible. Rather, probationers and parolees enjoy due process and statutory protections in the context of their revocation hearings. See Morrissey v. Brewer, 408 U.S. 471, 488-489 (1972) (stating that a parolee is entitled to confront adverse witnesses in a revocation hearing unless the hearing officer specifically finds good cause for not allowing such confrontation); Fed. R. Crim. Pro. 32.1(a)(2)(D) (providing that a person accused of violating probation or supervised release is entitled to a revocation hearing and an opportunity to confront adverse witnesses).

In United States v. Bell, 785 F.2d 640, 642-43 (8th Cir. 1986), we held that the trial court in a revocation proceeding must "balance the [defendant's] right to confront a witness against the grounds asserted by the government for not requiring confrontation." Id. (holding that it was not error to allow the government to introduce urinalysis laboratory results from a California laboratory through a probation officer who had not prepared the report and without live testimony from the laboratory technicians because the hearsay was reliable and the proposed testimony

7

was of little value). The need to apply this balancing test is well established in our circuit. See United States v. Reynolds, 49 F.3d 423, 426 (8th Cir. 1995) (holding that it was reversible error for a district court to fail to applying a balancing test before admitting oral hearsay testimony recounting a third party's allegations of sexual assault by the probationer); United States v. Zentgraf, 20 F.3d 906, 909-10 (8th Cir. 1994) (applying balancing test and determining that it was reversible error to admit oral hearsay testimony rather than direct testimony from probationer's accomplice who was in custody and available to testify); United States v. O'Meara, 33 F.3d 20, 20-21 (8th Cir. 1994) (per curiam) (holding that it was reversible error to admit oral hearsay in the form of probation officer's comments on police reports, testimony about conversations with a state agent concerning criminal sexual conduct charges against O'Meara, and videotapes prepared by a state agent who was not a witness).

The record is sufficient for our application of the balancing test which supports the implicit findings of the district court, namely, that the evidence admitted was reliable and that the de minimis value of testimony from the proposed technician-witnesses did not outweigh the government's inconvenience and expense in making those witnesses available.

The present case is analogous to Bell because the hearsay that was admitted was reliable and the testimony proposed by Redd is of little value. Unlike the Reynolds, Zentgraf, and O'Meara cases, the evidence at issue here was not oral hearsay. Rather the evidence was documentary evidence of a type normally understood to be reliable. See United States v. Baker, 855 F.2d 1353, 1359 (8th Cir. 1988) ("When made on a routine basis, laboratory analyses of controlled substances are admissible as business records under Federal Rule of Evidence 803(6)."). Documentary hearsay evidence generally provides greater indicia of reliability than oral hearsay. This distinction is reflected in numerous long-standing exceptions to the hearsay rule. See, e.g., Fed. R. Evid. 803 (6)-(18) (permitting the admission of various records or the absence of record entries in various settings). We believe that

8

here, as in <u>Bell</u>, the laboratory reports "bear substantial indicia of reliability. They are the regular reports of a company whose business it is to conduct such tests, and which expects its clients to act on the basis of its reports." <u>Bell</u>, 785 F.2d at 643 (citation omitted).

We do not believe that any possible testimony from laboratory technicians (who likely would not remember their treatment of an individual sample as having been distinct from the treatment of any other sample) outweighs the expense and inconvenience to the government of bringing such ministerial witnesses from California. As this court stated in <u>Bell</u>:

> We conclude that under these circumstances there was good cause to permit the government to avoid the difficulty and expense of bringing the chemist or chemists who performed the tests from California to Arkansas to testify. *In our experience, that sort of formal testimony rarely leads to any admissions helpful to the party challenging the evidence.*

<u>Id.</u> (emphasis added). The Seventh Circuit has concurred in this view. <u>See</u> <u>United States v. Pierre</u>, 47 F.3d 241, 243 (7th Cir. 1995) (admitting the results of a urinalysis test over hearsay objections based on the absence of the laboratory technician). The Seventh Circuit stated:

> What was the technician going to say on the stand? One vial of urine looks like another; the technicians would not have remembered what they did with [the probationer's] specimens and therefore would have described their normal procedures, and the judge would not have been enlightened.

<u>Id.</u> Accordingly, with regard to the absence of testimony from the California laboratory technicians, we find that the district court's implicit findings are supported under our application of the requisite balancing test. Regarding the United States' failure to call the local officers who applied and removed Redd's sweat patches as

9

witnesses, we again find, for the reasons set forth above, that the reliability of the documentary evidence and the minimal value of the desired testimony outweigh the need for confrontation.

Had it been error for the district court to fail to vindicate Redd's confrontation rights regarding these witnesses, such error would have been harmless. Redd–who was necessarily present for the application and removal of the sweat patches–was capable of describing the process of applying and removing the patches from his body. Notwithstanding the availability of Redd's first hand observations, the district court concluded that "there is no evidence of any conditions that could potentially produce a false positive result to any of the sweat patches that were applied to defendant." In other words, Redd, having observed the handling of the patches, failed to articulate any theory or allege any facts to suggest how the patches might have become contaminated other than by his own drug use. Here as in Bell, any examination of the technicians would have been a mere "fishing expedition." Bell, 785 F.2d at 643 ("Bell has made only general, unsubstantiated claims that the laboratory tests may have been defective."). The lack of evidence to support a theory of contamination coupled with the fact that there were six separate positive test results (when only one positive result would be sufficient to support revocation) supports our conclusion that the failure to permit a fishing expedition with the technician-witnesses would have been harmless error had it been error at all.

The district court is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT

10